RAYMOND HANSEN, APPELLEE, V. THE VILLAGE OF RALSTON, APPELLANT.

18 N. W. 2d 213

FILED APRIL 6, 1945. No. 31879.

*L. B. McDonald* and *W,ebb, Beber & Kelly*, for appellant. *Gross, Crawford & Welch, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, CHAPPELL and WENKE, JJ.

WENKE, J.

This action, commenced in the district court for Douglas county by Raymond Hansen against the Village of Ralston, a municipal corporation, is in trover to recover damages for the conversion of personal property. From a verdict directed in favor of the plaintiff, in which the jury determined his damages to be the sum of $5,166.66, the village appeals.

The plaintiff and appellee will be referred to as Hansen; the defendant and appellant as the village.

The record discloses that in 1937 the village created a project, under the Works Project Administration, to develop a public park. For this purpose it obtained the Cudahy Packing Company's lake and the Lakewood Country Club's grounds, which were developed as Ralston Park. In February of 1937 the village entered into an agreement with George L. Berger to operate it as a public park, golf course and bathing beach. Under this agreement Berger was to purchase, pay for and own all equipment necessary for that purpose.

In order to finance the purchase of the necessary equipment, Berger, on July 15, 1937, entered into an agreement with Henry J. Beal whereby Beal was to and did furnish the money to buy the equipment. Under their agreement the title to the equipment was to be in Beal, subject to Berger's right to purchase for one dollar after the money advanced had been repaid. This is further evidenced by a bill of sale to all this equipment from Berger to Beal, dated August 15, 1938. Berger never repaid the money advanced by Beal.

After Berger had equipped the park it was opened to the public on May 15, 1938. Berger continued to operate it until August 4, 1939. The village became dissatisfied with his management and canceled his contract on that date.

In order that the village could keep the park operating and that Beal might get back the money he had invested in the park and the equipment, it was then agreed by Despecher, the mayor of the village, Berger and Beal, that

Beal would leave the equipment in the park and a balance due on the P. B. Buller account would be paid. This balance was in the form of a conditional sales contract by P. B. Buller with the Ralston Amusement Company. At this time a complete inventory of all the equipment was taken by Berger and Despecher.

It is not entirely clear from the record but apparently the Ralston Amusement Company, a corporation, came into existence at or about this time. It consisted of Despecher, the mayor, as president, Henry J. Beal, as secretary, and Melvin Bekins. The village leased the park to this company. The company leased it, in turn, to King George, Coschka, Linder, Schuhart and Sklenicka. None of these parties were successful in the operation thereof and as a consequence the village took over. During this time Beal left the equipment in the park and the Ralston Amusement Company paid out its balance on the conditional sales contract with Buller. In August of 1941 the village purchased and had tags placed on the equipment with the following inscription: "The Property of the Village of Ralston."

During this period, and up until in January of 1943, Beal had a key to the park and he and Berger were given the right to remove any of the equipment upon giving Shields, the village marshal, a receipt therefor. During 1942 a truck, paint gun, two boats, a table and four chairs and 126 lockers were removed and a boat was sold under this arrangement. On or about January 2 or 3 of 1943 some locker room benches were taken out.

By this time the village board had completely changed its membership from what it had been in 1938. Although it had been permitting Berger and Beal to take equipment out of the park and it had been orally passed down by the members of the board that Beal was the owner of the equipment, nevertheless, after the lockers and benches were taken out the board decided that no more equipment should be removed until it had decided who were the rightful owners thereof. The board caused the locks on the buildings to be changed and, through the town marshal, Berger and Beal

were notified of its action. After Shields had notified him, Beal wrote to the village board asking that an inventory be taken of the equipment. Thereupon McDonald, the village's attorney, called on Beal. Beal told McDonald he owned the equipment and wanted an inventory taken before he would take any action. Thereafter he wrote McDonald to that effect. Beal then received a letter from the mayor of the village dated March 8, 1943, which is in part: "Henry J. Beal, Ralston, Nebraska. The Village Board has assumed that the fixtures and equipment in the clubhouse and bathhouse belong to the village. However, if our assumption is without grounds, we would like to have this clarified. We would be pleased to meet with you in the near future, backing your claim. You can doubtless produce evidence as to the ownership of equipment and for fixtures at the club grounds and if so, we will gladly relinquish our claim. * * * ."

Thereafter Beal transferred all his interest in the equipment to Hansen by a bill of sale dated March 10, 1943. When Hansen appeared to get the equipment he was advised by the village mayor he could not get it unless he appeared before the village board and was able to establish his right thereto. Neither Hansen, Berger, Beal, nor any one in their behalf ever responded to the board's request that they appear before it for the purpose of establishing their ownership to the equipment.

The records of the village were very poorly kept and contain no information as to the ownership of the equipment outside of the Berger contract. The evidence establishes that whatever equipment Berger put in the park belongs to Hansen. However, there is some evidence that equipment was purchased for the park through other sources, including $12,000 used for that purpose from the drainage funds.

The village's principal complaint is to that part of instruction No. 4 given by the court which directs a verdict for Hansen and the court's refusal to give the instruction it requested.

That part of instruction No. 4 complained of is as fol-

lows: "There is no competent evidence on the part of the defendant to disprove the foregoing statements, and you are instructed that the plaintiff is entitled to recover from the defendant whatever amount you may find is the fair and reasonable market value of the property in question as of January 16, 1943, * * * ."

The instruction requested by the village is as follows: "You are instructed that 'Bona fide reasonable detention of property by one who has assumed some duty respecting it, to ascertain its true ownership, or to determine right of demandment to receive it, will not sustain action for conversion.' "

It is the duty of the court to direct a verdict on an issue when the evidence which has been offered is not sufficient in law to make out the case of the party who has offered it. However, in reviewing such an issue, on which the trial court directed a verdict in favor of the plaintiff, this court will assume the existence of every material fact favorable to the defendant, which competent evidence tends to establish, and give him the benefit of all logical inferences to be drawn therefrom and if the evidence presents any conflict of a material fact as to the issue, send it back to be submitted to a jury.

Where the defendant has come into the possession of property lawfully or without fault, it is generally necessary to make demand of possession of him before suit will lie since there is no conversion until there has been a refusal to surrender such possession. See 2 Cooley, Torts (4th ed.), sec. 335, p. 517; note, 24 Am. St. Rep. 807; 38 Cyc. 2032. However, a demand and refusal are not essential when it is clear that a demand would have been useless or unavailing. See 65 C. J., sec. 67, p. 47.

The undisputed evidence established that demand was made on the village before suit was brought.

In *Farming Corporation v. Bridgeport Bank*. 113 Neb. 323, 202 N. W. 911, we held: "A *bona fide* reasonable detention of property by one who has assumed some duty respecting it, for the purpose of ascertaining its true ownership, or

of determining the right of the demandant to receive it, will not sustain an action for conversion." See 61 A. L. R. 622, and authorities there cited; 26 R. C. L., sec. 28, p. 1117; *Sutton v. Great Northern Ry. Co.,* 99 Minn. 376, 109 N. W. 815; 38 Cyc. 2029. This is more fully discussed in 26 R. C. L., sec. 34, p. 1124, as follows: "Though an absolute refusal to deliver property creates an inference in law that there has been a conversion, a qualified refusal to deliver property is not, per se, a conversion thereof, and one sued for conversion should be permitted to show that his refusal to deliver the property was not unconditional, but was accompanied by a reasonable qualification or requirement. Hence, declarations made by a party, at the time, in response to a demand for the possession of property, may be received in evidence in his favor, to show that his refusal was qualified and reasonable, and not of a character to render him liable for a conversion. Moreover, a refusal of goods after demand is no conversion, if the circumstances show that it is caused by a reasonable apprehension of the consequences, in a doubtful matter. In many instances, a qualified refusal to deliver the goods in question, on demand, has been held not to constitute a conversion, when such qualification is reasonable and stated in good faith."

Did the village have a right to refuse the demands of Beal and Hansen for the purpose of determining who was the owner of the equipment and entitled thereto? This would be true if its qualified refusal was reasonable and in good faith. There is no question but what the evidence is sufficient to sustain a finding by the jury that the qualified refusal of the village was not reasonable and in good faith and that the village had converted the property to its own use. However, there is evidence that the personnel of the village board changed completely during the period from 1938 to January of 1943; that outside of the Berger contract of 1937 there was nothing in the records of the village to show who owned this equipment; that the only information the board had was from its dealings with Berger and Beal and from some of its members; that after Berger was

discharged and while the village was operating the park some equipment was bought; that the Buller conditional sales contract, covering part of the property, was in the name of the Ralston Amusement Company; and that money from the drainage funds was used to buy equipment. From the record as a whole we cannot say, as a matter of law, that the position taken by the board was not reasonable and in good faith. There is evidence from which the jury could have found that the qualified refusal of the village board was reasonable and in good faith under all of the facts and circumstances and that there had been no conversion of the equipment by the village. As stated in *Sutton v. Great Northern Ry. Co., supra*: "It is ordinarily for the jury, under proper instructions from the court, to pass upon the existence of the qualification and its reasonableness." We find the trial court erred in directing a verdict for the plaintiff on the issue of conversion and that it should have been submitted to the jury on the issue here discussed.

The village further complains of the court admitting the testimony of Berger and Buller as to the value of the equipment.

The evidence shows Berger purchased much of the equipment, was in charge thereof during the time he operated the park, helped make the inventory shortly after August 4, 1939, saw it at various times, observed its condition up until in April of 1943 and kept himself informed as to the value of such equipment.

Buller's business was the buying and selling of fixtures and supplies. He sold much of the equipment that Berger placed in the park and in April of 1943 observed what equipment was left there and its condition. He was generally posted and familiar with equipment of this kind.

While it is true that a witness who knows nothing about the goods in question does not become competent to testify to their value merely by examining inventories and invoices, see *Dyer v. Rosenthal*, 45 Mich. 588, 8 N. W. 560, however, the opinion of a witness who is shown to be acquainted with the property and its value in the market is competent to tes-

tify as to such value, see *Daly v. W. W. Kimball Co.*, 67 Ia. 132, 24 N. W. 756, and the credibility of the witness and the weight of his testimony are questions for the jury.

For the reasons stated, the verdict and the judgment thereon are reversed and set aside and a new trial ordered.

REVERSED.